# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Augusta Division

| | |
|---|---|
| In the matter of: )<br>)<br>STACY C. DAVIS, )<br>)<br>)<br>Debtor. )<br>_____ ) | Chapter 7 Case<br><br>Number 12-11122 |

FILED
Lucinda B. Rauback, Clerk
United States Bankruptcy Court
Savannah, Georgia
By dreese at 2:25 pm, Jan 20, 2015

### OPINION AND ORDER FINDING THAT DEBTOR'S DEBTS ARE "PRIMARILY CONSUMER DEBTS" WITHIN THE MEANING OF 11 U.S.C. § 707(b)(1)

This case is before the Court on the Motion of the United States Trustee to Dismiss Pursuant to 11 U.S.C. § 707(b) ("Motion to Dismiss") (dckt. 53) filed by Guy G. Gebhardt, Acting United States Trustee, Region 21 ("U.S. Trustee"). This will be the third written order issued in an effort to move toward a final ruling on the Motion to Dismiss Stacy C. Davis's ("Debtor") Chapter 7 case.[1] The narrow issue addressed by the Court in this order is whether Debtor's debts are primarily consumer debts, which will in turn determine whether the "means test" of § 707(b) applies in this case.[2] The Court concludes that Debtor's mortgage on her personal residence is a consumer debt and that the amount of that debt is

---

[1] Judge Barrett issued an order on March 22, 2013, which answered in the affirmative the threshold issue of whether § 707(b) applies to cases that are converted from Chapter 13 to Chapter 7. (Dckt. 59.) Next, Judge Barrett denied U.S. Trustee's Motion for partial summary judgment on the issue now before the Court, namely whether Debtor's debts are primarily consumer debts. (Dckt. 85.)

[2] A Chapter 7 debtor is required to file a statement of her current monthly income and the calculations that determine whether a presumption of abuse arises under 11 U.S.C. § 707(b)(2)(A)(i). See 11 U.S.C. § 707(b)(2)(C). These calculations are submitted on Official Form B22A, which is commonly referred to as the "means test."

AO 72A
(Rev. 8/82)

over half in amount of all Debtor's debts. Therefore, Debtor's debts are primarily consumer debts, and the trial on the remaining issues raised by the Motion to Dismiss will be scheduled for a hearing.

I.    **JURISDICTION**

This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a), and the Standing Order of Reference signed by Chief Judge Anthony A. Alaimo on July 13, 1984. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(A) (providing that core proceedings include "matters concerning the administration of the estate"). In accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure, the Court makes the following findings of fact and conclusions of law.

II.    **FINDINGS OF FACT**

A.    **Procedural History**

Debtor filed her Chapter 13 petition and plan on June 26, 2012. (Dckt. 1, 3.) Huon Le, the Chapter 13 Trustee ("Trustee"), filed a response to Debtor's plan asserting a number of objections regarding the accuracy and necessity of certain claimed expenses. Trustee also objected to a plan provision that provided for the "strip off" of a second mortgage and asserted that Debtor had not committed all of her projected disposable income (calculated on Official Form B22C) to unsecured creditors. (Dckt. 12.) On August 1, 2012, Trustee filed a second objection to confirmation stating that Debtor should schedule as an asset her "100% interest in business and correct value of personal property." (Dckt. 18.) On

August 14, 2012, Trustee filed a third objection to confirmation asserting that Debtor cannot be a Chapter 13 debtor because her "noncontingent, liquidated, unsecured debts" total $376,497.57, which exceeded the corresponding debt limit of 11 U.S.C. § 109(e) in effect at the petition date. (Dckt. 22.) At the August 20, 2012 hearing on plan confirmation, Trustee again raised the issue of eligibility, which Debtor did not dispute, and Judge Barrett entered an order directing that the case would be dismissed unless Debtor converted her case to Chapter 7 within fourteen days. (Dckt. 26.)

As a result, Debtor moved to convert her case to Chapter 7 on August 24, 2012. (Dckt. 27.) The order converting the case was entered on August 27, 2012. (Dckt. 31.) On September 25, 2012, Debtor filed her Amended Chapter 7 Statement of Current Monthly Income and Means-Test Calculation. (Official Form 22A, dckt. 49.) On October 1, 2012, U.S. Trustee filed his Statement of Presumed Abuse (dckt. 50) based on Debtor's means test calculation and subsequently filed the Motion to Dismiss (dckt. 53) on October 29, 2012.

Judge Barrett granted a period of discovery to the parties before ruling on the threshold issue of whether 11 U.S.C. § 707(b) applies to cases converted from Chapter 13 to Chapter 7. She ruled in her Order of March 22, 2013 that the provision did apply. (Dckt. 59.) Afterwards, the parties continued to pursue discovery, and Judge Barrett denied U.S. Trustee's motion for partial summary judgment on the issue of whether Debtor's debts are primarily consumer debts.

For purposes of the trial on the Motion to Dismiss, the parties agreed to bifurcate the hearing of the issues and first litigate whether Debtor's debts are primarily consumer debts. The Court held an evidentiary hearing on that issue on December 11, 2014.[3] The parties stipulated to the admissibility of eleven joint exhibits, including certain real estate records and Debtor's responses to discovery requests. (Dckt. 107.) The Court heard testimony from only one witness besides Debtor. Debtor called Travis Burkett, a state certified residential real estate appraiser. At the conclusion of the hearing, the Court took the matter under advisement.

B. **Summary of Debtor's Debts**

Debtor's schedules as originally filed in June 2012 reflect the following debts:

Table 1: Schedule D (Secured Debts)

| Description of Debt | Amount of Claim Without Deducting Value of Collateral |
|---|---|
| SunTrust Mortgage (First Lien) | $620,000.00 |
| SunTrust Bank (Second Lien) | $ 41,631.42 |
| Subtotal: | $661,631.42 |

Table 2: Schedule E (Unsecured Priority Debts)

| Description of Debt | Amount of Claim |
|---|---|
| Georgia Taxes | $10,000.00 |
| Federal Taxes 2010 | $27,522.00 |
| Federal Taxes 2011 | $28,000.00 |
| Subtotal: | $65,522.00 |

---

[3] Judge Barrett recused herself on June 16, 2014, and the case was reassigned to the undersigned judge. (Dckt. 89.)

4

Table 3: Schedule F (Unsecured Nonpriority Debts)

| Description of Debt | Amount of Claim |
| --- | --- |
| Revolving Credit (5 Claims) | $ 45,916.72 |
| Personal Loan | $ 30,000.00 |
| Federal Taxes (2005–2008) | $206,891.00 |
| SunTrust (3 Claims) | $ 56,167.85 |
| Subtotal: | $338,975.57 |

(Dckt. 1, at 15–20.)

Without debating whether most of her other debts are consumer debts, Debtor conceded that if the *first* mortgage on her personal residence is determined to be a consumer debt, then her debts will be primarily consumer debts. That is, because $620,000.00[4] represents about fifty-eight percent of her total indebtedness of $1,066,128.90, her debts would be *primarily* consumer debts.[5] Likewise, U.S. Trustee conceded that if the Court finds that the first mortgage is a business debt, then the means test would not apply in this case and Debtor would be eligible for a Chapter 7 discharge.[6] Accordingly, the parties were able to focus on a single issue: is the first mortgage a consumer debt?

---

[4] SunTrust Mortgage, Inc. filed a proof of claim in this case asserting a $623,761.30 secured claim with respect to this debt. (Claim 10.)

[5] "A debtor has 'primarily consumer debts' if more than half of that debtor's total debts are consumer debts." *Southwick Real Estate, LLC v. Ades (In re Ades)*, No. 08-86062, 2009 WL 6498520, at *4 (Bankr. N.D. Ga. July 2, 2009).

[6] If a Chapter 7 debtor's debts are not "primarily consumer debts," then that debtor is not required to complete the means test. *See In re Woodard*, No. 09-10201, 2009 WL 1651234, at *2 (Bankr. M.D.N.C. June 10, 2009).

### C.  Debtor's Acquisition and Financing of the Heggies Ridge Property

Debtor is currently, and has been for all years relevant to the issue before the Court, a physician employed by her own professional corporation, Stacy C. Davis, MD, PC. Her medical practice is located in Augusta, Georgia. In early 2005, she became pregnant with her second child while living with her first child and husband[7] in her sister's home. Around that time, she became interested in buying her own home to accommodate her growing family, but she later decided to buy a lot and build a home instead of purchasing an existing home.

Debtor and her then husband, Reginald Davis, looked at homes in Evans, Georgia in the price range of $300,000.00 to $400,000.00 but did not find one that they wished to purchase. At some point, they became aware that Reginald's cousin, a contractor, had built a house in Alpharetta and sold it for $1 million, making a substantial profit. That cousin provided Reginald with a copy of the building plans for the Alpharetta house, which was a five-bedroom, 8,000-square-foot home.

On February 16, 2005, Debtor acquired title to a five-acre tract of land commonly known as 697 Heggies Ridge Drive in Appling, Georgia ("Heggies Ridge property") by warranty deed and paid about $73,000.00 for the vacant lot. (UST Ex.1, at 1.) Appling is in unincorporated community in Columbia County, Georgia. Debtor made a down

---

[7] Debtor and her former husband are now divorced.

6

payment of approximately $7,500.00 and executed a security deed in favor of SunTrust Bank for the balance of $67,451.40. (UST Ex. 1, at 4). On June 3, 2005, Debtor obtained a $639,000.00 construction loan from First Bank Mortgage with a final maturity date of June 10, 2006. (UST Ex. 2.) The proceeds from that loan were used, in part, to satisfy the debt owed to SunTrust Bank to purchase the land. (UST Ex. 3.) The remaining loan proceeds were used to build a home using the building plans that Reginald got from his cousin.

Reginald served as the general contractor for the home's construction despite his lack of building experience. At that time, he was employed as an office manager for Debtor's medical practice but had previously worked as a substitute teacher. Debtor testified that Reginald took on the role of general contractor because he thought it might lead to a new career constructing homes. Recognizing that Reginald lacked the skills necessary for the task at hand, Debtor insisted that a construction manager be employed to hire subcontractors and to supervise the work. A construction manager, who was recommended by Debtor's father, was in fact hired.

When the First Bank construction loan came due in June 2006, the home was about ninety-percent complete. In order to finish the construction, Debtor and Reginald obtained a $650,000.00 mortgage from SunTrust Mortgage, Inc. on July 27, 2006.[8] (UST Ex. 5.) They used the proceeds from this mortgage to pay off the construction loan with First

---

[8] Debtor quitclaimed a one-half undivided interest in the property to Reginald on July 27, 2006. (UST Ex. 4.)

7

Bank. (UST Ex. 6.) The mortgage has an adjustable interest rate and requires monthly payments for twenty-nine years. In connection with the SunTrust mortgage, Debtor executed a document titled "Construction Loan Agreement," as well as a document titled "Uniform Residential Loan Application," which reflected that the purpose of the loan was for Debtor's primary residence. (Debtor's Ex. 1, at 5, 10.)[9] About a month after obtaining the mortgage, Debtor and her family moved into the Heggies Ridge property and, eight years later, she continues to reside there.

Debtor testified unconvincingly that she did not intend at the time she acquired the construction loan to *ever* move into the Heggies Ridge property. Further, she testified that she intended to build the home for $500,000.00 and sell it for $650,000.00, so that she would have about $150,000.00 of "equity" to use as a down payment so that she could afford to purchase an existing home in the $300,000.00 to $400,000.00 range.

In general, her testimony revealed that she had no real investment strategy in acquiring this property. She testified that the construction manager told her that the house could be built for $80.00 per square foot. At that figure, the home would have been constructed for about $640,000.00. Nevertheless, Debtor testified that she thought the home could be built for only $500,000.00 because they were saving money with Reginald acting as the general contractor. She also stated, without further elaboration, that they were going

---

[9] Page two of three of the Construction Loan Agreement was missing from the original of the exhibit.

8

to get the subcontractors to lower their bids. The Court does not find this testimony credible. In actuality and unfortunately, the cost to build homes was increasing in Columbia County and, in the end, Debtor's home cost significantly more to build than the $80.00 per square foot figure supposedly relied on when they took out the construction loan.

Debtor's expert witness, Travis Burkett, testified about trends relating to new home construction in Columbia County, Georgia during 2003 to 2014. Using published statistical data and focusing on five specific properties for comparison purposes, Burkett testified at some length regarding median sales prices and prices per square foot. The purpose of this testimony was to convince the Court that Debtor and her husband hoped to ride the wave of increasing property values to obtain a substantial return on their investment. Although it is doubtful this witness was qualified to opine regarding such matters, he had no personal knowledge of the couple's activities at the time of the acquisition. That is to say, he had *nothing* to offer on the question before the Court, namely whether Debtor intended to build the house as an investment at the time she borrowed the money.

### III. CONCLUSIONS OF LAW

"After notice and a hearing, the court, . . . on a motion by the United States trustee, . . . may dismiss a case filed by an individual debtor under [chapter 7] whose debts are *primarily consumer debts*, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter. . . ." 11 U.S.C. § 707(b)(1) (emphasis added). The Bankruptcy

Code defines a "consumer debt" as a "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). "The Trustee as the movant bears the burden of proof to establish that Debtor's debts are primarily consumer debts." *In re Davis*, No. 12-11122, 2013 WL 6092223, at *3–4 (Bankr. S.D. Ga. Oct. 25, 2013) (Barrett, J.) (earlier order in this case).

"The proper inquiry is to examine the debtor's purpose at the time the debt is incurred to determine whether the debt is a consumer debt." *Id.* at *3 (citing *In re Cox*, 315 B.R. 850, 855 (B.A.P. 8th Cir. 2004)). "With respect to debt secured by real property, if the debtor's purpose in incurring the debt is to purchase a home or make improvements to it, the debt is clearly for family or household purposes and fits squarely within the definition of a consumer debt under § 101(8)." *In re Cox*, 315 B.R. at 855 (citing *Zolg v. Kelly (In re Kelly)*, 841 F.2d 908, 913 (9th Cir. 1988)); *accord Price v. U.S. Tr. (In re Price)*, 353 F.3d 1135, 1139 (9th Cir. 2004); *Turner v. Johnson (In re Johnson)*, 318 B.R. 907, 914 (Bankr. N.D. Ga. 2005) ("[S]ecured debt incurred to purchase a home, i.e., a residential mortgage, is consumer debt."); *In re Praleikas*, 248 B.R. 140, 144–45 (Bankr. W.D. Mo. 2000) (noting that the "overwhelming majority of courts" consider purchase money mortgages on residential property to be consumer debts and later mortgages as well to the extent that the loan proceeds are used for "non-business purposes, such as consolidating other consumer debts or for home improvement"). In contrast, "courts have concluded uniformly that debt incurred for a business venture or with a profit motive does not fall into the category of debt incurred for

'personal, family, or household purposes.'" *Cypher Chiropractic Ctr. v. Runski (In re Runski)*, 102 F.3d 744, 747 (4th Cir. 1996).

Debtor's main argument is that her plan when incurring the construction loan was to use the profit from the sale of the Heggies Ridge property for a down payment to purchase an existing home closer to her practice. She contends that the following shows that this was her intent: the Heggies Ridge property (1) had specifications that would allow for an easy resale (she thought), (2) was too big for her family, and (3) was located farther away from her medical practice than she would have liked. If the Court believes her version of events, she argues that the construction loan would not be a consumer debt. *See IRS v. Westbury (In re Westbury)*, 215 F.3d 589, 593 (6th Cir. 2000) (noting that if "the debt was 'incurred with an eye toward profit,'" then the debt falls outside the category of consumer debt (quoting *In re Booth*, 858 F.2d 1051, 1055 (5th Cir. 1988))).

Although Burkett's testimony was consistent with Debtor's argument that the Heggies Ridge property could have been intended to be a "spec house" due to the real estate mania that was prevalent at that time, the totality of the evidence before the Court shows that her primary intent was to build a home for her family to live in. Her attempt to argue, after the fact, that she just made a bad real estate investment is unavailing. Her motive for making such an argument is clear: there are favorable legal consequences if the debt is a business debt rather than a consumer debt.

At the hearing, Debtor repeatedly stated that she would sell her home today if offered the amount of the outstanding indebtedness on the property. In light of the fact that property values have declined since she built the house, the Court does not doubt the sincerity of this statement from Debtor. However, what controls for purposes of the Court's determination is what her intent was at the time she incurred the debt; her intent with respect to the Heggies Ridge property today is irrelevant. *See In re Davis*, 2013 WL 6092223, at *3 (citing *In re Cox*, 315 B.R. at 855).

Debtor contends the alleged fact that her former husband was using this transaction to get into a new, home-construction career somehow makes this debt not a consumer debt. Reginald did not testify. The Court heard no significant testimony regarding how this project was part of that career plan. Instead, Debtor only made a passing remark that it might *lead* to a career. Regardless, it appears that Reginald did not have the required skills to complete the house, and Debtor insisted that a construction manager be employed.

Debtor's vague suggestions about building below cost, or creating equity by taking shortcuts on certain features of the home, belies any meaningful strategy for creating an investment. *See In re Naut*, No. 07-20280REF, 2008 WL 191297, at *6 (Bankr. E.D. Pa. Jan. 22, 2008) (finding that although the debtor, "like all other homeowners, apparently hoped that the [home] would appreciate in value, the objective evidence in the record show[ed] that the [home] was purchased and used as [the debtor's] personal residence"). To

be sure, the transaction proved to be a poor decision in light of decreasing property values, but that certainly does not transform a consumer debt into an investment or business debt.

In sum, the Court finds Debtor's statements regarding her intent not credible. This case is simple. She desired to move to a home that would accommodate her growing family. She did not find a home that she desired to purchase. So, she bought a lot and built a home in which she intended for her family to reside—at least for some period of time. Therefore, the construction loan in this case is the quintessential consumer debt. *See Kelly*, 8411 F.2d at 913 ("It is difficult to conceive of any expenditure that serves a 'family . . . or household purpose' more directly than does the purchase of a home and the making of improvements thereon." (alteration in original)).

Apparently believing the result would be different, Debtor argues the fact that the debt on the Heggies Ridge property was later refinanced should not matter because "the Court must classify the debt based upon the intent in its initial acquisition." (Dckt. 105, at 6.) In support of her position, Debtor cites *Sherlock v. Herdelin*, No. 04-cv-3438, 2008 WL 732146 (E.D. Pa. Mar. 17, 2008), *aff'd*, 434 F. App'x 57 (3d Cir. 2011); *Gombosi v. Carteret Mortgage Corp.*, 894 F. Supp. 176 (E.D. Pa. 1995), *aff'd*, 91 F.3d 123 (3d Cir. 1996) (table decision); and *In re Naut*, 2008 WL 191297; however, all of those cases are inapposite. *Sherlock* and *Gombosi* provide no persuasive authority for Debtor's position because those cases interpret the Truth-in-Lending Act, *not* the Bankruptcy Code. In *In re Naut*, the court found that debt incurred to purchase and improve a home that was used as the debtor's family

residence was still a consumer debt despite the fact the debtor and his family later moved out of the home and then regarded it solely as an investment. The situation in this case is factually distinguishable from *In re Naut* because Debtor's intent has remained consistent.

Finally, the Court's conclusion is the same regardless of whether the time the debt was incurred is viewed as the initial acquisition of the debt (the First Bank construction loan) or the later refinancing of that debt (the SunTrust mortgage) because both debts are consumer debts when analyzed independently. Regarding the construction loan, the Court has extensively discussed above why that obligation is a consumer debt. As U.S. Trustee argues, the later acquired mortgage is also a consumer debt if analyzed independently. Debtor's stated intention in the loan documents for the mortgage that she would use the property as her personal residence confirms this. By the time she obtained the mortgage, she already knew that she was not going to be able to sell the home quickly or for a profit. Instead, she incurred this debt so that the house could be finished and she and her family could move into the home.

The Court is persuaded that U.S. Trustee has met his burden to prove that Debtor's debts are primarily consumer debts. Therefore, the Court will schedule the remaining issues raised by the Motion to Dismiss (dckt. 53) for a final hearing.

## ORDER

For the foregoing reasons, the Court finds that Debtor's debts are primarily consumer debts within the meaning of 11 U.S.C. § 707(b)(1). Therefore, the Court will schedule the remaining issues raised by the Motion to Dismiss (dckt. 53) for a final hearing.

Dated at Savannah, Georgia, this 20th day of January, 2015.

_____
Edward J. Coleman, III
United States Bankruptcy Judge
Southern District of Georgia